**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **15-04644-jw**

# ORDER

The relief set forth on the following pages, for a total of 24 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**02/18/2016**



*John E Waites* (signature)

US Bankruptcy Judge
District of South Carolina

Entered: 02/18/2016

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 15-04644-JW |
| | Chapter 13 |
| Sean Patrick Flood, | **ORDER** |
| Debtor(s). | |

This matter comes before the Court for a hearing on confirmation of the Chapter 13 Plan filed by Sean Patrick Flood ("Debtor") and the Objection to Confirmation filed by Christi Lynn Cosson ("Cosson"). At the same hearing, the Court considered Debtor's Objection to Claim of Cosson and Cosson's response thereto. After reviewing the pleadings and the arguments and evidence presented at the hearing on these matters, the Court makes the following findings of facts and conclusions of law.[1]

## FINDINGS OF FACT

1.      Debtor and Cosson were married on May 5, 2001.

2.      At the beginning of their marriage, Debtor worked as part of a management sales training program and Cosson worked in the retail and food service industries. By the latter part of their marriage, Debtor and Cosson made a living by developing and managing real estate. At the hearing, Debtor submitted the income tax return for the parties' final year of marriage, which listed their joint-income as $108,247. Cosson testified that the parties' joint-income during the marriage was $120,000, which was the amount of income the parties listed when obtaining financing.

---

[1]      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are so adopted.

3.      The parties separated on or about September 27, 2006. Around the time of the separation, Cosson moved from Atlanta, Georgia to Salt Lake City, Utah.

4.      The parties entered a separation agreement ("Agreement") in May of 2007. At that time, the parties jointly owned three residential properties: 438 South Howard Street in Georgia ("438 S. Howard"),   230 Holzclaw Street in Georgia ("230 Holzclaw"), and 735 S. 900 E., in Salt Lake City, Utah ("Utah Property"). In addition, at the time of the Agreement, Debtor owned a 50% interest in six businesses that developed real estate in the Atlanta area.

5.      The Agreement was adopted by final judgment and decree of divorce on December 3, 2007 and filed with the Clerk of Superior Court in DeKalb County, Georgia on December 4, 2007.

6.      The Agreement provides that counsel represented Debtor in the negotiations of the Agreement and the divorce proceedings. Cosson testified and the Agreement reflects that she was not represented by counsel during the negotiations of the Agreement or the divorce proceedings. The Agreement includes separate sections addressing support and maintenance, division of real property, division of personal property and payment of debts.

7.      Section 2 of the Agreement, entitled "Support and Maintenance of Wife and Husband"  provides that:

> Neither party shall be obligated to make any periodic or lump sum payment to the other for his or her support and maintenance, and both parties accept the terms and conditions of this Agreement as a full, final and complete settlement of any and all alimony claims which either may have against the other. This Agreement shall constitute a release of all such claims by either party for such claims against the other, including the right to modification of alimony pursuant to OCGA § 19-6-19 et seq. Both parties hereby waive their statutory right to future modifications, up and down, of any alimony payments, or their rights to apply for alimony payments, based upon a change of income or financial status of either party.

8.      Section 3 of the Agreement is entitled "Equitable Division of Real Property." Subsection 3(a) provides that, in consideration of the distribution of the marital real property, Debtor shall pay Cosson no less than $70,000.00.[2] The $70,000 amount included Cosson's share of the estimated equity as of the date of the Agreement in 230 Holzclaw ($30,000) and 438 S. Howard ($10,000) as well as Debtor's obligation to pay up to $20,000 for one year of mortgage payments on the Utah Property.[3] The Agreement also provides that, upon the sale of 230 Holzclaw and 438 S. Howard, Debtor shall pay to Cosson a share of any additional equity realized above the parties' estimates included in the Agreement. Upon their separation, Debtor retained 230 Holzclaw and 438 S. Howard, and Cosson retained the Utah Property after the divorce.

9.      To address their interest in the real estate development businesses, subsection 3(e) of the Agreement ("Business Provision") provides the following:

> [Cosson] hereby transfers any and all interest she may have in any business entities in which [Debtor] may have an interest including, but not limited to, East Village Properties, LLC, 964 DeKalb, LLC, F & F Development Partners, LLC, Desoto Investments, LLC, and Desoto Development and agrees to execute any and all documents requested by [Debtor] evidencing said fact. In consideration of said undertakings by [Cosson], [Debtor] shall pay to [Cosson] the following lump sum payments: (1) $200,000 to be paid within 12 months of the execution of this Settlement Agreement; (2) $50,000 to be paid within 24 months of the execution of this Settlement Agreement; (3) $50,000 to be paid within 36 months of the execution of this Settlement Agreement.

---

[2]      Debtor was to pay the $70,000 in the following manner: $15,000 paid upon the signing of the Agreement, $20,000 paid six months after the signing of the Agreement, $15,000 paid twelve months after the signing of the Agreement and up to $20,000 of mortgage payments on the Utah Property paid each month during the first year after the signing of the Agreement. The Court notes that subsection 3(a) of the Agreement refers to subsection 4(d). A review shows that the Agreement does not include a subsection 4(d). It appears that the parties intended to refer to subsection 3(d) as both subsections refer to Debtor's obligation to pay $20,000 to Cosson.

[3]      It is unclear from the Agreement and the testimony provided by the parties at the hearing as to what constitutes the remaining $10,000 of the Debtor's obligation to pay Cosson $70,000.

3

10.    The Agreement also provides that Cosson would retain the parties' Hummer H2 and that she would be responsible for the ongoing loan payments on that vehicle. Cosson testified that the loan payments on the vehicle were $1,000 a month.

11.    Section 5 of the Agreement, entitled "Payment of Existing Debts," obligated Debtor to pay Cosson's pre-marital student loan debt in the approximate amount of $34,000 by February of 2009. Cosson testified that, during the marriage, she deferred payments on her student loan at the request of Debtor so that they could invest more capital into Debtor's businesses.

12.    Section 16 of the Agreement is entitled "Non-Taxable and Bankruptcy" and provides that:

> The parties acknowledged that the payments provided for in Items 3, 8, 9 and 14 of this Agreement, as part of the equitable division of marital property, shall not be deductible to [Debtor] for income tax purposes nor taxable to [Cosson]. However, the parties also acknowledge that, but for said payments, [Cosson] should not be able to be financially independent and would depend upon [Debtor] for support on a regular basis in order to provide herself with necessaries and meet her monthly expenses. Therefore, it is the parties' intention that if [Debtor] ever seeks bankruptcy protection, the amounts payable under Item 3, 8, 9, and 14 as division of marital property and otherwise shall not be dischargeable in bankruptcy under 11 U.S.C. 523 [§] (a)(5), as the payments are in the nature of alimony, support and maintenance.

13.    A review of the Agreement shows that Item 8, entitled "Entire Agreement," Item 9, entitled "Voluntary Agreement and Waiver of Discovery", and Item 14, entitled "Consent to Jurisdiction" do not include payment obligations. Therefore, it appears section 16 of the Agreement ("Bankruptcy Provision") only references the payments in section 3 of the Agreement, which includes Debtor's obligation to pay $70,000 to Cosson and his $300,000 obligation stated in the Business Provision.

4

14.    At the hearing, Debtor testified that both he and Cosson were self-supporting and that, during their marriage, Cosson managed and developed one of their residential properties, which resulted in a $37,542 profit. Further, he testified that the parties intended for the obligations under the Agreement to divide marital property and that he did not deduct any of his payments on his income taxes.

15.    Cosson testified at the hearing that, after the separation, she moved to Utah with the immediate intention of renovating the Utah Property and that the parties intended for the lump sum payments under the Agreement to be used to repair the Utah Property, provide for Cosson's support, and assist her in obtaining a refinancing of the Utah Property. Cosson also testified that, in order to work on the renovations of the Utah Property, she did not seek outside employment when she initially moved to Utah.  Thereafter, Cosson worked as a cocktail waitress for three to four days a week until she obtained a full time employment in 2009.

16.    At the hearing, Cosson admitted that Debtor's obligations under the Agreement would survive both the death of Debtor and her remarriage.

17.    Debtor initially made the payments as obligated under the Agreement. However in 2008, Debtor's real estate development businesses declined as a result of the collapse of the real estate market and resulting issues with financing. As a result, Debtor's businesses' properties were foreclosed upon in 2011. Around the same time as his businesses' decline, Debtor stopped making payments to Cosson under the Agreement. In total, it appears that Debtor has paid Cosson $83,485.05 since the parties entered the Agreement.[4]

---

[4]    This figure is derived from the parties' agreement that Debtor has paid $80,855.05 to Cosson as well as $2,600 of Cosson's student loan debt.

18.     On August 12, 2011, Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia ("Chapter 7 Case"). Debtor's Schedule E in the Chapter 7 Case listed Cosson as holding a $150,000 unsecured priority claim for domestic support obligations and noted that the basis of the claim is a "Divorce Property Settlement."[5] Further, in Schedule J, Debtor listed a $400 monthly expense for "Alimony, maintenance, and support paid to others." On September 15, 2011, the Trustee in the Chapter 7 Case filed a Report of No Distribution, and the court entered an Order Discharging Debtor and Closing Estate on November 30, 2011. The parties do not dispute that the obligations under the Agreement were not discharged in the Chapter 7 Case.

19.     On June 26, 2014, Cosson filed a Rule to Show Cause and Motion for Contempt in DeKalb County Superior Court regarding Debtor's missed payments under the Agreement. A hearing was scheduled in that court pursuant to the Rule to Show Cause and Motion for Contempt.

20.     Shortly before the hearing in DeKalb County Superior Court, Debtor filed a petition for relief under chapter 13 of the Bankruptcy Code on September 1, 2015.

21.     On September 24, 2015, Debtor filed a proposed Chapter 13 plan, which was amended on November 25, 2015 and December 3, 2015 (collectively "Plan"), which effectively treats any debt to Cosson as an unsecured claim without priority.

22.     Cosson filed a proof of claim on October 28, 2015 and subsequently amended that claim on November 20, 2015. The amended claim asserts that, based on the

---

[5]     While listed as a creditor in Debtor's prior bankruptcy case, Cosson alleges she did not receive notice or any filings in the Chapter 7 Case as she no longer lived at the address listed in Debtor's schedules and statements. Debtor alleges that Cosson had actual notice of the Chapter 7 Case as they had discussed it near the time that he filed the case.

6

obligations in the Agreement, Cosson holds a priority domestic support claim in the amount of $311,684.03.

23.    On November 12, 2015, Debtor filed an objection to Cosson's claim.

24.    On December 5, 2015, Cosson filed an objection to confirmation of Plan.

25.    At the hearing, Debtor's counsel and Trustee's counsel stated that if all obligations under the Agreement are determined to be non-dischargeable priority domestic support obligations, the Plan would not be feasible and could not be confirmed.

CONCLUSIONS OF LAW

Pursuant to 11 U.S.C. § 523(a)(5),[6] any debt for a "domestic support obligation" is not dischargeable under § 1328(b). Section 101(14A) defines a "domestic support obligation" as:

> [A] debt that accrues before, on, or after the date of the order for relief in a case under this title . . . that is—
> (A) owed to or recoverable by—
>    (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>    (ii) a governmental unit;
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of—
>    (i) a separation agreement, divorce decree, or property settlement agreement;
>    (ii) an order of a court of record; or
>    (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
> (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

---

[6]    Further references to the Bankruptcy Code shall be by section number only.

7

Under § 507(a)(1)(A), domestic support obligations are entitled to priority treatment. Further, under § 1322(a)(2), a proposed chapter 13 plan must provide full payment of the debtor's domestic support obligations, unless the debtor and holder of the domestic support obligation enter an agreement providing for different treatment of the claim. "However, other types of debt incurred by a debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree, or other order, including property settlements, are dischargeable in a chapter 13 case." In re Fickling, C/A No. 12-02719-jw, slip op. at p. 6 (Bankr. D.S.C. Oct. 2, 2012).

The issue before the Court is whether Debtor's obligations under the Agreement are domestic support obligations entitled to priority treatment in Debtor's proposed chapter 13 plan. "Federal Bankruptcy law governs the determination of whether a debt is in the nature of alimony, maintenance, or support." Id. at 7. The intention of the parties at the time of the settlement agreement determines if a debt is in the nature of alimony, maintenance or support. In re Robb, 23 F.3d 895, 897 (4th Cir. 1994) (citing Tilley v. Jessee, 789 F.2d 1074, 1077 (4th Cir. 1986)). This Court has considered multiple non-exclusive factors to assist in making this determination, including:

(1) The actual substance of the agreement;

(2) The financial situation of the parties at the time of the agreement;

(3) The function served by the obligation at the time of the agreement;

(4) Whether there is any evidence of overbearing at the time of the agreement that should cause the Court to question the intent of a spouse;

(5) The tax treatment accorded to the debt; and

8

(6) Whether the obligation terminates upon the death or remarriage of the

beneficiary.

See Fickling, C/A No. 12-02719-jw, slip op. at 7–8. The Court has also considered labels

used in a settlement agreement as persuasive evidence of the parties' intent. Id. at 8 (citing

Tilley, 789 F.2d at 1077–78).

### Debtor's Prior Bankruptcy Schedules

Debtor previously addressed his obligations under the Agreement in the Chapter 7

Case. Specifically, under Schedule E of that case, Debtor stated the obligations under the

Agreement were for a divorce property settlement and a domestic support obligation under

§ 507(a)(1). Further, he provided under Schedule J that his expenses included a $400 per

month domestic support obligation.

At the hearing, Cosson did not assert that judicial estoppel or a similar preclusion

doctrine prevented Debtor from asserting that the obligations are not domestic support

obligations in the current proceedings; however, Cosson did allege that the prior

designation is evidence of Debtor's intent that the obligations were to support Cosson.

Debtor testified that, at the time of his prior bankruptcy filing, he did not believe

that the obligations under the Agreement were for support and that he provided all of his

financial information to his prior bankruptcy attorney who drafted his schedules. To the

extent the characterizations were erroneous, he believed it was an error made by his prior

counsel.

Because both obligations for support and obligations for property settlements are

not dischargeable in a chapter 7 bankruptcy, there is little consequence to distinguishing

between the two in a chapter 7 proceeding.  See 4 Collier on Bankruptcy ¶ 523.11[1] (Alan

N. Resnick & Henry J. Sommer, eds., 2015) ("[W]ith respect to dischargeability in cases under chapters 7, 11 and 12, all of which base dischargeability on section 523(a), the distinction between a domestic support obligation and the other types of obligations arising out of a marital relationship is of no practical consequence."). Without more information and based on Debtor's testimony and the practical consequences of distinguishing between domestic support obligations and property settlements in a chapter 7 bankruptcy case, the weight of the evidence indicates that Debtor's prior designation of the obligations as a domestic support obligation is an error of his prior bankruptcy counsel and not an expression of Debtor's intent regarding the obligations.

### Waiver of Discharge

In the Bankruptcy Provision, the Agreement appears to make an attempt to control the consequences if Debtor filed a bankruptcy case and bind this Court to a finding that certain obligations of Debtor are not dischargeable. Specifically, the Agreement states that "if [Debtor] ever seeks bankruptcy protection, the amounts payable under Item 3, 8, 9, and 14 [of the Agreement] as division of marital property and otherwise shall not be dischargeable in bankruptcy under 11 U.S.C. 523 [§] (a)(5), as the payments are in the nature of alimony, support and maintenance." The language of the Bankruptcy Provision is inconsistent as it categorizes Debtor's obligations as both a "division of marital property" and "in the nature of alimony, support and maintenance." Additionally, the provision is inconsistent with the Agreement as a whole as other express language in the Agreement indicates that the obligations are part of the equitable division of marital property and that neither party is obligated to provide support and maintenance to the other spouse.

10

After consideration of the Agreement and the evidence presented at the hearing, the Court finds the Bankruptcy Provision constitutes an invalid prepetition waiver of discharge and is not dispositive as to whether Debtor's obligations under the Agreement are dischargeable.[7] See Fickling, C/A No. 12-02719-jw, slip op. at 9–10 (finding that a provision in a divorce agreement stating that certain obligations relating to the buyout of debtor's business were for support and not dischargeable in a chapter 13 bankruptcy case was an inappropriate pre-petition waiver of discharge); In re Trump, 309 B.R. 585, 593 (Bankr. D. Kan. 2004) ("[P]repetition agreements to waive the benefits of a bankruptcy discharge are void, and this Court is not bound by this language [in the Marital Settlement and Separation Agreement]."); In re Daniel, 290 B.R. 914 (Bankr. M.D. Ga. 2003) (finding that a waiver of discharge in a divorce-related settlement agreement is not dispositive in determining if a debt is dischargeable); Rogers v. Chorba (In re Rogers), C/A No. 08-30864, Adv. Pro. No. 08-3080, 2010 WL 1571196, at *3 fn. 8 (Bankr. D. Conn. Apr. 19, 2010) (finding that express nondichargeability provisions in a divorce-related property settlement agreement was unenforceable as a matter of federal law).

Courts have long established that a contractual agreement that "attempt[s] to control the outcome of a Bankruptcy Court's determination in a future bankruptcy filing . . . is against public policy since it undermines the fresh start provisions of the Bankruptcy Code." Fickling, C/A No. 12-02719, slip op. at 10 (citing The Infinity Group LLC v. Lucas (In re Lucas), 477 B.R. 236, 245–46 (Bankr. M.D. Ala. 2012); Hayhoe v. Cole (In re Cole),

---

[7]    The Court notes the similarity of the Bankruptcy Provision with the language of the divorce agreement in Fickling. In pertinent part, the language in Fickling provided that: "These payments to the wife are intended as equitable division and are therefore, non-taxable, however, the parties acknowledge that the same are a source of support to the wife which will assist her in meeting monthly expenses; therefore, they are not dischargeable in bankruptcy . . . ." Fickling, C/A No. 12-02719, slip op. at 3.  In Fickling, upon reviewing the divorce agreement as a whole, as well as the evidence presented at a hearing, the Court determined that the language was an invalid pre-petition waiver of discharge. Id. at 9–10.

226 B.R. 647, 650 (9th Cir. B.A.P. 1998)). Therefore, the inclusion of the Bankruptcy

Provision is not controlling and is merely additional evidence considered in determining

the characterization of the Debtor's obligations.

### Evidence of Overbearing, Tax Treatment and Termination of Debt

Turning to the non-exclusive factors considered by the Court when determining the

characterization of obligations in a divorce agreement, it does not appear that either party

was overbearing during the negotiations of the Agreement. "'If a spouse's will has been

overborn, that spouse could not intend to enter either a property settlement or support

agreement, and the creditor spouse cannot meet its burden of proving that the spouses'

intent was to enter a nondischargable support agreement.'" Pagels v. Pagels (In re Pagels),

C/A No. 10-71138, Adv. Pro. No. 10-07070, 2011 WL 577337 at *13 (Bankr. E.D. Va.

Feb. 9, 2011) (quoting Kettner v. Kettner, C/A No. 91-587-N, 1991 WL 549386 at *2 (E.D.

Va. Nov. 19, 1991)). While it appears that Debtor was the only party represented by counsel

during the negotiations and divorce proceedings, Cosson testimony reflects that she was

active in the negotiations of the Agreement and that certain provisions in the Agreement

were included at her suggestion. In addition, by equally splitting the estimated equity in a

number of properties, the Agreement appears to have been a fair arrangement between the

parties and contains favorable terms for both Cosson and Debtor.

As to the tax treatment of Debtor's obligations, a party's claim to a tax deduction

for an obligation stemming from a divorce-related settlement is evidence that supports a

finding that the obligation is in the nature of alimony, support and maintenance. See

Fickling, 12-02719-jw, slip op. at 15 (finding that the facts supported a finding that the

divorce settlement payments were for a property settlement and not alimony when debtor

did not claim a deduction for payments made pursuant to the settlement); <u>McCollum v.
McCollum (In re McCollum)</u>, 415 B.R. 625, 633 (Bankr. M.D. Ga. 2009) (finding that the
debtor's failure to claim a deduction for payments as alimony was evidence that the parties
did not intend for the payments to serve as support). The Agreement provided that the
Debtor's payments on the obligations were not deductible to Debtor and not taxable as
income to Cosson. Debtor testified that he has not claimed a deduction on his income tax
returns for any of his payments to Cosson. Therefore, the evidence supports a finding that
the obligations were intended to be a property division.

Regarding the termination of the obligations, if an obligation terminates upon a
spouse's death or remarriage, it supports a finding that the obligation is in the nature of
alimony, support or maintenance. <u>See</u> <u>McCollum</u>, 415 B.R. at 633–34 (finding that the
most important factor the court considered for determining if an obligation is for a property
settlement or support was that the obligation required full payment without regard to a
spouse's death or remarriage); <u>Carrigg v. Carrigg (In re Carrigg)</u>, 14 B.R. 658, 662 (Bankr.
D.S.C. 1981) (Davis J.) ("When an obligation terminates upon the death or remarriage of
the recipient spouse, or the death of the obligor spouse, some courts have held that alimony
and support, rather than a property settlement, were intended.").  In the instant case, the
parties agree that Debtor's obligations will survive the remarriage of Cosson and the death
of Debtor.[8] However, some of Debtor's obligations under the Agreement were for set
durations and terminated on a specific date, including his obligation to pay the mortgage

---

[8]      Cosson testified that she believes the obligations under the Agreement would terminate upon her
death. No credible evidence was provided to support this statement. In light of the language in the Agreement
and the evidence presented to the Court, the record does not support Cosson's statement that the obligations
terminate upon her death.

on the Utah Property. Therefore, based on the evidence and testimony presented at hearing, this factor appears to be neutral.

### Language of the Agreement

The substance of the Agreement also factors into the determination of the parties' intention for the characterization of the obligations. Debtor contends that the language and labels of the Agreement establish that his obligations are in the nature of a property settlement. Cosson contends that the language of the Bankruptcy Provision establishes the parties' intent that the obligations were to support her. As previously discussed, the Bankruptcy Provision is inconsistent with other language in the Agreement and is not conclusive. In light of this inconsistency, both the language of the Agreement as a whole and the specific language used to create Debtor's obligations must be examined to determine the substance of the Agreement.

A review of the Agreement shows that it is structured to delineate between its different sections and includes separate sections on property division and the parties' support and maintenance. In addition, the Agreement contains clear labels for each section. These stylistic features support a finding that the obligations contained in each particular section were intended to be characterized as labeled and create a substantial obstacle to overcome for any party asserting otherwise. See Tilley, 789 F.2d at 1077–78 (finding that a well-structured settlement agreement that purports to deal with separate issues in totally distinct segments of the documents creates a substantial obstacle to overcome for the spouse who is asserting a position in contrast with the structure of the agreement); Breibart v. Breibart (In re Breibart), C/A No. 03-07440-W, Adv. Pro. No. 04-80195-W, slip op. at 10 (Bankr. D.S.C. Mar. 22, 2005) (same).

As the language of Debtor's obligations varies throughout the Agreement, an individual analysis of each obligation is necessary. The Agreement contains three obligations in which the Debtor is required to make payments to or on behalf of Cosson.[9]

*$70,000 Obligation*

First, under the section labeled "Equitable Division of Real Property", Debtor is obligated to pay Cosson $70,000 within one year of the entry of the Agreement ("$70,000 Obligation"). As previously discussed, because the obligation is contained in the section entitled "Equitable Division of Real Property", it initially supports the conclusion that the parties intended the $70,000 Obligation to be a property settlement. However, as labels are not conclusive, a further examination is needed. It appears the $70,000 Obligation is based upon four separate considerations, which need to be reviewed individually.

According to the Agreement, $40,000 of the $70,000 Obligation represents Cosson's share in the estimated equity of the jointly-owned residential properties at 438 S. Howard and 230 Holzclaw. Further, the Agreement provides that, in consideration of Debtor's payment of the estimated equity, Cosson shall transfer her rights and interest in the properties to Debtor, as well as execute quitclaim deeds to him. As these provisions address the obligations in terms of property transfers and releases of interest, the language of the Agreement supports a conclusion that the $40,000 portion of the $70,000 Obligation was intended to be a property settlement.

The Agreement also states that $20,000 of the $70,000 Obligation represents Debtor's requirement to pay one year of the mortgage payments on the Utah Property,

---

[9]     In addition to the obligations discussed hereafter, Debtor was also obligated to pay $200 a month for one year on a credit account of Cosson's. However, from the evidence submitted, it appears that Debtor has satisfied this obligation, and therefore, the determination of whether that obligation is entitled to priority under § 523 is moot.

which was Cosson's residence at the time of the Agreement. In describing this obligation,
the Agreement states that the mortgage payments are for the benefit of Cosson and "shall
[be used] to pay [Cosson's] living expenses . . . ." The Agreement also provides that Debtor
shall transfer his rights and interest in the Utah Property to Cosson. Because of the express
language that the payments were for Cosson's living expenses for a limited period of time,
and because Debtor's payments appear to be unrelated to the existence of equity in the
Utah Property, the language of this provision best supports a conclusion that it was for the
support of Cosson.

It is unclear from the Agreement or the parties' testimony at hearing what
constitutes the remaining $10,000 of the $70,000 Obligation. Without further evidence, the
Court can only conclude that the language of the Agreement suggests that the remaining
portion of the $70,000 Obligation is intended to be a property settlement as it is contained
in the section labeled "Equitable Division of Real Property."

*$300,000 Obligation*

Debtor's second obligation under the Agreement is also provided for under the
section entitled "Equitable Division of Real Property" and requires Debtor to pay Cosson
$300,000 within three years after the entry of the Agreement ("$300,000 Obligation").  The
Agreement provides that in consideration of the obligation to make the $300,000 payment,
Cosson shall transfer any and all her interest in Debtor's businesses to Debtor. As the
provision is stated in terms of a transfer of property and release of Cosson's property
interest, it appears the language of the obligation supports a finding that it was intended to
be a property settlement.

16

*Student Loan Obligation*

Under the section entitled "Payment of Existing Debts", Debtor is obligated to pay the balance of Cosson's premarital student loan by February, 2009 ("Student Loan Obligation"). The totality of the Agreement indicates that Debtor is assuming the debt owed by Cosson without any corresponding consideration from her and that Debtor's assumption of this debt would assist Cosson in meeting her daily necessities by increasing her net available income. Without a corresponding property or debt division that detrimentally effects Cosson, it appears that Debtor's assumption of the student loan would be in the nature of support. Further, Cosson testimony supports a finding that the Student Loan Obligation was for her support as she stated that she deferred payments on her premarital student loan debt during the marriage upon the request of Debtor so that they could focus their assets on Debtor's businesses and that, as result of the deferment, Debtor agreed to be responsible for the student loan after their divorce.

**Financial Situation of the Parties and Function Served by the Obligations**

In addition to the language of a divorce-related agreement, a party's demonstration that support was needed at the time of the agreement is persuasive evidence that the parties intended for an obligation to be in the nature of alimony, maintenance and support. Fickling, C/A No. 12-02719, slip op. at 12. Also, the function served by an obligation, including whether it intended to provide for a spouse's daily necessities, is persuasive evidence of the parties' intent regarding the obligation's characterization. See Breibart, C/A No. 03-07440-W, Adv. Pr. No. 04-80195-W, slip op. at 17.

In the instant case, the parties dispute the financial situation of Cosson at the time of the Agreement. Cosson testified that, at the time of their separation, the parties travelled

17

to Salt Lake City, Utah, and purchased the Utah Property to be her residence. Cosson further testified and Debtor did not dispute that, at the time of its purchase, the Utah Property needed renovations and that Cosson's immediate plan upon moving to Utah was to dedicate her time and labor to improving the property and not to seek other employment. Conversely, Debtor testified that Cosson had a college education and work experience in the retail and food service industries and therefore was capable of obtaining employment. He further testified that at the beginning of their marriage, Cosson earned between $25,000 and $35,000 a year.

Beyond her testimony that she had a monthly payment of $1,000 for her vehicle, Cosson did not provide evidence indicating the details of her financial need or daily living expenses after her move to Utah. However, considering her lack of outside employment and her intention to renovate the Utah Property, it appears that Cosson needed limited financial support at the time of the Agreement. At that time, Cosson's primary employment was the management of parties' residential properties. Because Debtor retained most of their properties, her employment would have effectively ended upon their divorce.

Cosson's need for limited financial support is further evidence by the Agreement which states that without some of Debtor's payments under the Agreement, "[Cosson] should not be able to be financially independent and would depend upon [Debtor] for support on a regular basis in order to provide herself with necessaries and meet her monthly expenses."

By providing that Debtor would pay the mortgage payments on the Utah Property for one year after their separation, it appears the parties' intention was for Debtor to provide support to Cosson for the first year after their divorce. The best evidence in the record

regarding her need for support is the parties' joint-income in their final year of marriage.

Therefore, the Court finds that Cosson needed one-half of the parties' joint-income from

the year prior to the Agreement to support herself during the first year after the divorce.

Based on the evidence and testimony, the Court finds the parties' joint-income in the year

prior to the Agreement was $110,000 and that $55,000 was needed to provide Cosson with

support during the first year after the divorce.

Turning to the function of the obligations, it is not uncommon for divorcing parties

to interchange support payments with property settlements. It has been noted that:

> A spouse who is given more property usually needs less support and vice-
> versa. . . . An obligation denominated as a property settlement may be
> essential to meeting the support needs of the obligee spouse. Conversely an
> obligation denominated as alimony may be substitute for property the
> obligee would otherwise have received in addition to alimony or support.
> Indeed, few property settlement obligations could not, in some sense, also
> be considered to have a support function, at least in part.

Henry J. Sommer & Margaret Dee McGarity, Collier Family Law and the Bankruptcy Code

¶ 6.04[1] (2015). Several courts have found that obligations based on the division of

existing assets can be found to be support obligations if the parties or the divorce judge

intended for the property division to provide adequate additional support to a spouse. See

Werthen v. Werthen (In re Werthen), 329 F.3d 269 (1st Cir. 2003) (affirming bankruptcy

court's finding that obligations in a divorce order, which were labeled as property divisions

and composed of past pay outs of debtor's bonus and stock awards, were intended to

support the ex-spouse); In re Goin, 808 F.2d 1391 (10th Cir. 1987) (affirming bankruptcy

court's finding that a debtor's obligations based on ex-spouse's share in the parties' real

estate and stock were intended by the parties to support the ex-spouse);  Henry J. Sommer

& Margaret Dee McGarity, Collier Family Law and the Bankruptcy Code ¶ 6.05[6] (2015)

19

("When [homes or businesses] are jointly owned, it is common for one spouse to agree to give up the spouse's interest in the property in exchange for cash, or an agreement to pay cash in installments. While such arrangements are in one sense classic property settlements, dividing marital property, courts may nonetheless find the obligation to make payments to be in the nature of support . . . .").

In the instant case, the evidence supports a finding that Debtor's assumption of Cosson's student loan functioned as support to Cosson. In addition, as previously discussed, the Agreement and the evidence presented indicates that the parties contemplated providing Cosson with one year of support for her living expenses after their divorce in the amount of $55,000. The record indicates that the parties accomplish this by two means. First, Debtor's requirement to make mortgage payments on the Utah Property for one year served to supply Cosson with shelter during the first year after the divorce. For the remainder of Cosson's living expenses, the record indicates that the parties intended for certain property settlement payments to serve as additional support for Cosson. As the payments commenced within the first year of their separation, the property division component of the $70,000 Obligation served a dual function of dividing the marital property and providing $35,000 of support to Cosson for her daily necessities.

As to $300,000 Obligation, Debtor testified that the obligation is based on Cosson's share of the equity at the time of the Agreement in Debtor's businesses.[10] Further, it does not appear that the obligation was involved in the parties' intention to provide Cosson with

---

[10]    Debtor testified that the $300,000 amount is based on the estimated equity of the properties held by the real estate development businesses at the time of the Agreement. Specifically, Debtor stated that the estimated value of the properties owned by the businesses at the time of the Agreement was $9.2 million, while the liens on those properties were $8 million and that, because Debtor was a 50% owner of these companies, Cosson would have a 50% claim to his interest in the businesses' equity. Debtor's explanation of how the parties calculated the $300,000 Obligation appears to be credible.

one year of support since the payments for the $300,000 Obligation was not scheduled to commence until a year after the entry of the Agreement. Therefore, the record indicates that the $300,000 Obligation functioned as a property division of marital assets.[11]

### Conclusion

Considering all of the foregoing factors, the weight of the evidence supports a finding that the parties intended for the Student Loan Obligation to support Cosson. In addition, the evidence supports a finding that the parties intended for the Agreement to provide Cosson with one year of living expenses after their divorce, best represented by one half of their joint-income from the prior year in the amount of $55,000. To meet this support requirement, the parties intended that a portion of their property division serve as support to Cosson. Therefore, the Court finds that the parties also intended for $55,000 of the $70,000 Obligation to serve as support for Cosson. As to the remaining obligations under the Agreement, the weight of the evidence supports a finding that the parties intended the obligations to serve as a property division of martial assets.

### Priority of Claim

Cosson's amended proof of claim states a total unsecured claim in the amount of $311,684.03. Both parties have submitted the same accounting of Debtor's payments under the Agreement, and it does not appear that the accounting is disputed.[12] In regards to the support components of the $70,000 Obligation, the accounting shows that Debtor satisfied

---

[11]    In addition to the foregoing factors, the Court also considered that Debtor's businesses suffered a significant decline since the entry of the Agreement due to the financial crisis of the real estate market and that, by 2011, all of the businesses' properties had been foreclosed. It appears that the failure of the businesses equally hurt Debtor and Cosson financially. As such, it appears that a finding that the $300,000 Obligation is a dischargeable property settlement would not result in a windfall to Debtor.

[12]    Debtor submitted the accounting as an exhibit at the hearing and Cosson attached the accounting to her proof of claim. It also appears that the total claim amount included in Cosson's amended proof of claim is based in part on the figures provided in the accounting.

his requirement to pay $20,000 in mortgage payments on the Utah Property and also paid $30,000 of the remaining $35,000 intended as support for Cosson.[13] Therefore, $5,000 of the $70,000 Obligation remains due for the support of Cosson and should be treated as a priority claim under § 523.

In regards to the Student Loan Obligation, the Court finds that $31,400 of the Student Loan Obligation was not paid and remains due from Debtor and should be treated as a priority claim under § 523.[14] Therefore, based on these findings, Cosson has a total priority claim in the amount of $36,400 under § 523 and an unsecured claim without priority in the amount of $275,284.03.

---

[13]    The accounting shows that Debtor deviated from the payment structure under the Agreement. In total, Debtor paid $30,555.73 in 30 smaller payments from December 2007 to January 2009. These payments include $11,155.73 of additional mortgage payments on the Utah Property that Debtor made from May 2008 to November 2008, after he had completed his obligation to make one year of payments on the property. The parties did not provide an explanation of whether any of these payments were in nature of support or for the division of property. Without evidence or an explanation to the contrary, the Court finds that these smaller payments were not made in lieu of or in satisfaction of the Debtor's support payments determined under this Order.

[14]    The figures provided by the parties regarding the Student Loan Obligation do not appear to reconcile. The Agreement provides that the total payoff of the student loan at the time of the Agreement was approximately $34,000. At the hearing, Cosson submitted an exhibit showing that, since the entry of the Agreement, Debtor has paid $2,600 on the student loan. Also, at the hearing, Cosson submitted an exhibit showing the breakdown of her amended proof of claim, which states that the current payoff of the student loan is $20,169.08 and that Cosson has paid $1,517.09 on the loan. It appears there is an unexplained decrease in the student loan balance as payments have been made since the Agreement totaling $4,117.09, but the loan's balance has decreased by approximately $13,830.92. As Debtor was responsible under the Agreement for the entire balance of the student loan, including any additional accrued interest, the Court finds that the most equitable method of determining Debtor's remaining obligation on the student loan is to deduct Debtor's payments made on the loan from the approximate balance of the student loan at the time of the Agreement.

<u>CONCLUSION</u>

Based on the foregoing reasons, it is ordered that Debtor's Objection to Claim is sustained in part and denied in part. The proof of claim filed by Cosson may be treated as a priority unsecured claim in the amount of $36,400 and an unsecured claim without priority in the amount of $275,284.03. Debtor current proposed chapter 13 Plan only provides treatment of Cosson's claim as an unsecured claim without priority; therefore, it is further ordered that Cosson's Objection to Confirmation is sustained and Debtor shall have ten days from the entry of this Order to file an amended chapter 13 plan to meet the requirements of this Order.

**AND IT IS SO ORDERED.**

Columbia, South Carolina
February 18, 2016